UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DOMINIQUE ASHBY,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )        No. 4:09 CV 914 HEA/DDN
                                    )
                                    )
 MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,    )
                                    )
                Defendant.          )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

        This action is before the court for judicial review of the final
decision of defendant Commissioner of Social Security denying the
application of plaintiff Dominique Ashby for disability insurance
benefits and supplemental security income under Titles II and XVI of the
Social Security Act (the Act), 42 U.S.C. §§ 401-34, and §§ 1381-1383f,
respectively.  The action was referred to the undersigned United States
Magistrate Judge for review and a recommended disposition under 28
U.S.C. § 636(b).  For the reasons set forth below, the undersigned
recommends that the ALJ's decision be affirmed.

**I.  BACKGROUND**

        Plaintiff, who was born in 1983, filed applications for Title II
and Title XVI benefits on March 29, 2007. (Tr. 92-102.)  He alleged an
onset date of disability of December 17, 2006, due to a shattered left
leg sustained in a motor vehicle accident that day. (Tr. 92, 118.)

        Plaintiff's applications were denied initially and a timely request
for a hearing was filed.  (Tr. 49-58, 60.)  On December 23, 2008,
following a hearing, an administrative law judge (ALJ) rendered a
decision, finding that plaintiff was "disabled" as defined under the Act
from December 17, 2006 to March 31, 2008, but not thereafter.   (Tr.
12-23.)  On April 14, 2009, the Appeals Council denied plaintiff's
request for review. (Tr. 1-3).  Thus, the decision of the ALJ stands
as the final decision of the Commissioner.

## II.  MEDICAL AND OTHER HISTORY

On December 17, 2006, plaintiff was admitted to the Kenneth Hall Regional Hospital emergency room following a motor vehicle accident. He sustained a fracture of his left tibia and fibula and a cerebral concussion with loss of consciousness.  (Tr. 202.)

Plaintiff was transferred to St. Louis University (SLU) Hospital where he was hospitalized until January 11, 2007.   (Tr. 192-94.) Surgery was performed on December 17 and 20, and pins and rods were placed in his leg.  (Tr.  235-38, 241-42.)

Plaintiff, who had served in the military, was transferred to Jefferson Barracks Veterans Hospital for inpatient antibiotics, rehabilitation, and follow-up appointments. (Tr. 326.) Prior to his accident plaintiff was working in security at Lambert Airport, but was unable to return to work after the accident.  (Tr. 499.)  He was instructed not to return to work until follow-up appointments were completed and his activity level was changed. (Tr. 326.)

From January 29 to February 16, 2007, plaintiff was treated at the Cochran VA Medical Center (VA) for right thigh pain which revealed an abscess on his right thigh for which a drain was placed. (Tr. 325, 451.) A physical therapy note indicated that walking aggravated the pain, and that he experienced numbness in the left thigh and knee, left foot, and right thigh.  (Tr.  463.)  He was to receive physical and occupational therapy three times a week for six weeks.  (Tr. 475.)

On February 2, 2007 plaintiff still had complaints of right thigh pain and swelling.  (Tr. 323.)  Physical examination revealed that the left lower extremity had a distal[1] deformity from surgery and a drain in the lateral aspect of the right side. (Tr. 323.)  Vacuum assisted closure therapy (vacuum therapy or negative pressure wound therapy)[2] was

---

[1]Situated away from the center of the body, or from the point of origin; specifically applied to the extremity or distant part for a limb or organ.  Stedman's Medical Dictionary 572 (28th ed. 2006).

[2]Negative pressure wound therapy devices can help in the healing and closure of wounds. They create negative pressure (a vacuum) at
(continued...)

started.  From February 17 to March 2, 2007, he received in home care with a skilled nurse as needed.  (Tr. 336.)  By April 13, 2007, plaintiff no longer needed vacuum therapy for his right thigh wound. Four skilled nursing home visits were scheduled.  (Tr. 541.)

On April 24, 2007, four months after the accident, plaintiff was seen at the VA.  X-rays showed a delayed union of plaintiff's left tibia fracture.  His left femur showed progressive healing.  (Tr. 328.) Plaintiff was to continue physical therapy for strengthening of the left leg. (Tr. 328.)  Physical therapy goals included increasing his range of motion and improving his gait. (Tr. 329.)

A Physical RFC Assessment completed by R. Taxman on June 7, 2007 indicated that plaintiff can occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about six hours in an 8-hour workday and sit about 6 hours in an 8-hour workday.  (Tr. 807-12.)  The assessment noted there were no treating or examining source statements in the file.  (Tr. 812.)

A Disability Determination and Transmittal dated June 8, 2007 and completed by T. Gamayo indicated that plaintiff's impairments were severe and demonstrated a residual functional capacity (RFC) for light work within 12 months of his onset date.  Because the plaintiff was 24 years old, he would be able to do other work.  (Tr. 50.)

August 27, 2007 x-rays showed plaintiff's fibula fracture appeared to be healed solidly, but that there was still a nonunion[3] of his tibia fracture.  (Tr. 813-814, 1357.)

On November 27, 2007, plaintiff was seen in the VA's Orthopedic Department.  His tibia still showed a delayed and possibly infected nonunion.  He admitted to resuming smoking and was encouraged to stop. It was hoped the delayed union would proceed to union.

---

[2](...continued)
well-sealed wound sites that can help remove fluids and infectious materials and draws wound edges together. http://www.webmd.com/fda/negative-pressure-wound-devices-draw-fda-notice-advice (last visited April 19, 2010).

[3]Failure of normal healing of a fractured bone.  Stedman's at 1330.

On April 1, 2008, plaintiff was seen by William Ricci, M.D., Orthopedic Trauma Service Chief at Barnes Jewish Hospital, upon referral by the VA. Dr. Ricci noted that x-rays showed healed fractures, that all of plaintiff's wounds were well healed, and that there was no tenderness over the fracture sites. (Tr. 21, 1365.) There was, however, tenderness and crepitance (crackling) over his femoral locking bolts. (Tr. 1365.) Dr. Ricci recommended removal of the locking bolts, but plaintiff did not want to do so. (Tr. 1365.) Records dated April 3, 2008, indicate that plaintiff served in the Middle East and had been diagnosed with Post Traumatic Stress Disorder. (Tr. 1352.) On May 29, 2008, plaintiff was a no-show for an orthopedic follow-up.

On May 16, 2008, plaintiff was seen in primary care at the VA and diagnosed with depression. (Tr. 1348.) A prescription for percocet, a narcotic pain reliever, was refilled.

On September 23, 2008, plaintiff was seen by Robert Shively, M.D., orthopedist at the VA, for a refill of his percocet. He had not been seen in the orthopedic department there since November 2007. At that time he complained of pain on the lateral side of his left femur. Plaintiff noted a grinding sensation in his left leg with flexion and extension of his knee and increased pain with prolonged standing and walking. Dr. Shively believed his complaints of pain were localized to the distal locking screws from the femoral nail. Dr. Shively believed he had "gone on to union as he is no longer complaining of any pain at the fracture site." "His complaints of pain are localized to the distal locking screws from the femoral nail. . . . Rather than to continue potent narcotic analgesics I think he should have the locking screws removed." (Id.) He noted that plaintiff was very reluctant to have any further operative procedure. (Tr. 1342.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on November 6, 2008. Plaintiff testified that he was single. He testified that he has a driver's license and drives to St. Louis Community College at Forest Park where he attends classes daily. (Tr. 29.)

Plaintiff testified he last worked on December 16, 2006. (Tr. 30.)

He testified that the following day, December 17, 2006, he was involved in an automobile accident where he fell asleep at the wheel, drove off an overpass, and landed on top of a fence. (Tr. 30.) The fence post went through his left leg, shattering his lower leg and breaking his upper leg. (Tr. 30.) Titanium rods and pins were placed in his leg. His calf muscle had to be detached from the back of his leg and moved to the front of the leg. (Tr. 31.)

Plaintiff testified that he began work with Whelan Security on October 12, 2006. (Tr. 31-32.) He testified he had also worked at Lambert Airport checking vehicles for explosives and that this job required him to stand 8 to 12 hours per day. (Tr. 32.) He testified that after his accident he was not able to return to work with Whelan. (Tr. 32.)

Plaintiff testified he does not have health insurance and receives whatever treatment he can from the VA; that he has not worked since his accident; and that he receives $14.00 per month in food stamps. (Tr. 32-33.) He testified that he served in the military during the Iraq war and was honorably discharged in 2006. (Tr. 33-34.)

Plaintiff testified that he has daily pain from the fractures and subsequent surgeries which make difficult for him to sleep at night. (Tr. 34.) He testified that he takes Oxycodone for pain twice a day, but it only helps so much and leaves him drowsy, dizzy, and disoriented. (Tr. 34.) He testified that sitting too long in a car causes his leg to hurt. (Tr. 35.) He testified that his VA doctors prescribed the cane for walking and that he previously used a walker. (Tr. 35-36.)

Plaintiff testified that he has problems with his right leg because he has to overcompensate for his left leg not being able to function as before; that he has pain in his right knee due to overcompensating; and that he is only able to walk short distances without his cane. (Tr. 36.)

Plaintiff testified his community college classes are 50 minutes long; that while sitting in class he has to move around and adjust his leg, usually by elevating his leg on another desk; that he can sit in a chair for 15 minutes without having to elevate his leg, but he still has to move around to adjust the position he is sitting in; that he can

stand with his cane in one position for five to seven minutes; and that he can walk 200 or 300 feet with his cane without needing to sit down. He further testified that he is unable to squat because of his injury, and that he can climb stairs, but cannot maneuver high steps. (Tr. 36-38.)

Plaintiff further testified that he is 6'4" tall, weighs about 280 pounds, and has lost weight since his accident. (Tr. 38.) He testified that he cannot climb ladders, mow the lawn, or rake leaves, but that prior to his injury, he was able to pick up heavy objects, run, and jump. (Tr. 39-40.) He testified that currently he can barely walk, and the most he can lift is about 25 pounds. (Tr. 40.)

James Israel, a vocational expert (VE), testified that he had an opportunity to view the vocational information on plaintiff. (Tr. 42.) The VE asked plaintiff to describe his past work, including his military communications work from 2002 to 2006. The VE characterized plaintiff's work as follows: plaintiff's work in fast food was unskilled and in the light to medium exertional level; his telemarketing work was semi-skilled and sedentary; and his work as a security officer was semi-skilled and usually light. The VE testified that plaintiff's military service work was high level, semi-skilled to skilled, with two aspects, liaison communication and equipment repair. The VE testified that plaintiff's military knowledge would not necessarily transfer readily to civilian work. (Tr. 43.) The VE testified that plaintiff would not have current transferable skills in the civilian labor market based on his work background. (Tr. 43-44.)

The VE testified as to a hypothetical individual of plaintiff's age, education, height, weight, and experience who had been involved in an auto accident involving a broken tibia and femur; who had thereafter undergone surgical repair which included the insertion of titanium rods in his upper and lower left leg; who had plaintiff's prior experience in airport security; who walks with a cane; who takes Oxycodone; who cannot stand for longer than 5 minutes without needing to move around or sit down; who cannot sit longer than 5 to 7 minutes without having to adjust, move around, or raise his leg; who can walk 200 to 300 feet at a time without needing to stop; and who cannot run, jump, or squat.

The VE concluded that there was no sustainable employment available. (Tr. 44-45.)

### III. DECISION OF THE ALJ

On December 23, 2008, the ALJ entered an unfavorable decision. The ALJ found that plaintiff was disabled from December 17, 2006 to March 31, 2008. (Tr. 18-19.) However, due to a medical improvement related to plaintiff's ability to perform work, his disability ended on March 31, 2008. (Tr. 19.) The ALJ then determined that, beginning on April 1, 2008, plaintiff had the RFC to perform light work, except that he could not stand and walk for greater than two hours in an eight-hour workday, 30 minutes at a time, nor could he sit more than six hours in an eight-hour workday. (Tr. 19.) In addition, plaintiff could not crawl or climb ladders, ropes, or scaffolds; and he could only occasionally stoop, kneel, crouch, or climb ramps and stairs. (Tr. 19.) The ALJ then found that plaintiff's limitations had little or no effect on the occupational base of unskilled light work. (Tr. 22.) In so doing, the ALJ referenced Social Security Rulings (SSR) 85-15 and 96-8p, finding that plaintiff's limitations after March 31, 2008, had "insignificant impacts" on the sedentary and light occupational base of jobs. (Tr. 22.) Using the Medical Vocational Guidelines as a framework, the ALJ concluded that plaintiff was not disabled beginning April 1, 2008. (Tr. 22.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." <u>Id.</u> In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. <u>Id.</u> As long as substantial evidence supports the decision, the court may not reverse it merely because

substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Id. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

## V. DISCUSSION

Plaintiff argues the ALJ erred in (1) applying the Medical Vocational Guidelines or "Grids" when he suffers from the nonexertional impairment of pain; and (2) failing to identify specific jobs that he could perform.

## A. Use of the Medical-Vocational Guidelines or "Grids"

Plaintiff argues the ALJ erred in applying the Medical-Vocational Guidelines or "Grids" because he suffers from the nonexertional

impairment of pain. The Commissioner contends that plaintiff is incorrect for two reasons: (1) pain is neither intrinsically exertional or nonexertional; and (2) the mere existence of a nonexertional impairment does not always preclude use of the Guidelines.

Nonexertional limitations are those that affect a claimant's ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, walking, lifting, carrying, pushing or pulling. <u>Burnside v. Apfel</u>, 223 F.3d 840, 844 (8th Cir. 2000), citing 20 C.F.R. § 404.1569(a). Nonexertional impairments can include hypertension, obesity, and pain. <u>Evans v. Chater</u>, 84 F.3d 1054, 1056 (8th Cir. 1996).

"Nonexertional capacity considers any work-related limitations and restrictions that are not exertional. Therefore, a nonexertional limitation is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions are also considered to be nonexertional." SSR 96-9p, 1996 WL 374185, at * 5 (Soc. Sec. Admin. July 2, 1996).

Where the claimant has a nonexertional impairment, such as pain, the ALJ may not exclusively rely on the vocational grids to determine disability but must also consider the testimony of a vocational expert. <u>Haley v. Massanari</u>, 258 F.3d 742, 747-48 (8th Cir. 2001); <u>Vincent v. Apfel</u>, 264 F.3d 767, 769 (8th Cir. 2001). Thus, the grid is only used when the components of the grid precisely match the characteristics of the claimant. <u>Thompson v. Bowen</u>, 850 F.2d 346, 349 (8th Cir. 1988).

The exception to the general rule is that the ALJ may rely exclusively on the guidelines even though there are nonexertional impairments if the ALJ finds, and the record supports the finding, that the nonexertional impairments do not *significantly* diminish the claimant's RFC to perform the full range of activities listed in the guidelines. <u>Reed v. Sullivan</u>, 988 F.2d 812, 816 (8th Cir. 1993)(emphasis in original).

In this context, "significant" refers to whether the claimant's nonexertional impairment or impairments preclude the claimant from

engaging in the full range of activities listed in the Guidelines under the demands of day-to-day life.  <u>Lucy v. Chater</u>, 113 F.3d 905, 908 (8th Cir. 1997).  "Under this standard isolated occurrences will not preclude the use of the Guidelines, however persistent nonexertional impairments which prevent the claimant from engaging in the full range of activities listed in the Guidelines will preclude the use of the Guidelines to direct a conclusion of disabled or not disabled."  <u>Id.</u>

In this case the ALJ found that plaintiff had some nonexertional limitations, specifically, limitations in his ability to crawl, climb, stoop, kneel, and crouch. (Tr. 19.)  Nevertheless, the ALJ's use of the Guidelines was not improper because he found those limitations had little or no effect on the occupational base of unskilled light work. (Tr. 22.) Specifically, the ALJ cited Social Security Rulings 85-15 and 96-8p in finding that plaintiff's limitations had "insignificant" impacts on the sedentary and light occupational base of jobs.  (Tr. 22.)  SSR 85-15 states that "[w]here a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work.... If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact."  Further, where the effects of a person's actual limitations of climbing and balancing on the occupational base are difficult to determine, a vocational expert "may" be necessary.  <u>See</u> SSR 85-15.

The ALJ found that plaintiff's nonexertional limitations had little or no effect on the occupational base of unskilled light work. (Tr. 22.) Plaintiff presented no evidence to the contrary.  The ALJ noted that Dr. Ricci examined plaintiff on April 1, 2008, noting that x-rays showed healed fractures, that all of his wounds were well healed, and that there was no tenderness over the fracture sites. (Tr. 21, 1365.)  There was, however, tenderness and crepitance over the femoral locking bolts. (Tr. 1365.)  Although Dr. Ricci recommended removal of the locking bolts, plaintiff did not wish to do so. (Tr. 1365.)  Plaintiff also did not keep his orthopedic appointment the following month. (Tr. 1343.)

Additionally, September 2008 treatment notes from Dr. Shively show that plaintiff was attending junior college, that his gait was normal,

and that he had full left knee range of motion. (Tr. 1342.) Dr. Shively also recommended removal of the locking screws, the source of his pain. (Tr. 1342-43). Dr. Shively believed that their removal would result in the diminution, if not complete relief, of plaintiff's discomfort. (Tr. 1342.) Plaintiff declined to act on Dr. Shively's recommendation. (Tr. 1342.)

The ALJ noted that while it is not appropriate to require a claimant to have surgery, where medical evidence exists showing that his pain might be relieved by doing so, the claimant's refusal to follow medical recommendations is properly considered while assessing the credibility of his complaints. (Tr. 21.) See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001) (ALJ may properly consider the claimant's noncompliance with a treating physician's directions). In this case, plaintiff's credibility was diminished because the evidence showed he did not seek orthopedic treatment between November 2007 and April 2008, he failed to keep orthopedic appointments, and he went for a lengthy period of time without narcotic medication. (Tr. 21, 1343, 1351.)

The undersigned concludes the ALJ sufficiently discussed the record evidence demonstrating the improvement in plaintiff's medical condition which was related to his ability to perform work activities. The ALJ determined that plaintiff's limitations had an "insignificant impact" on the sedentary and light occupational base of jobs. (Tr. 22.) Plaintiff presented no credible evidence to the contrary. The undersigned notes plaintiff does not assert that the ALJ erred in his credibility or RFC determinations. Rather, he argues that the existence of pain alone prohibits use of the Guidelines.

As a general rule, the Guidelines may not direct a finding of disability where nonexertional impairments exist that preclude the performance of the full range of work at a given exertional level. In cases where a Guideline Rule may *not* direct a conclusion, full consideration must be given to all of the relevant facts in the case, including the claimant's RFC, age, education, and work experience. The Guidelines may then be used as a framework for the jobs or types of work which the claimant may perform. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00 (2009).

The ALJ in this case discussed the record evidence, assessed plaintiff's credibility, and found that plaintiff retained the RFC for light unskilled work. (Tr. 19.) The ALJ found that plaintiff's nonexertional limitations had "little or no effect" on the occupational base of light unskilled work. (Tr. 22.) The functional capacity to perform a wide or full range of light work represents substantial work capability compatible with making a work adjustment to substantial numbers of unskilled jobs. See 20 C.F.R. Part 404, Subpt. P, App. 2, § 202.00(b)(2009). Further, the functional capacity to perform a full range of light work also includes the functional capacity to perform sedentary work. See 20 C.F.R. Part 404, Subpt. P, App. 2 § 202.00(a)(2009). Accordingly, the undersigned concludes the ALJ's use of the Guidelines was not improper. See also Reynolds v. Chater, 82 F.3d 254, 258-59)(where the ALJ properly discredits the claimant's complaint of a nonexertional impairment, the ALJ is not required to consult with a vocational expert and may properly rely on the vocational guidelines at step five).

**B.    Specific jobs plaintiff could perform**

Plaintiff also argues the ALJ erred in failing to identify specific jobs that he could perform. Specifically, he argues that once the ALJ found that the claimant could not perform the full range of light work from April 1, 2008 onward, the burden was on the ALJ to show specific alternative work he could perform. Plaintiff argues the ALJ failed to meet this burden because the only question the ALJ asked the VE was to describe his past work instead of inquiring about specific jobs he was able to perform. He notes the VE did not identify specific jobs he could perform and opined that he was not employable under the hypothetical.

The Medical-Vocational Guidelines take administrative notice of "the numbers of unskilled jobs that exist throughout the national economy." 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(b). "Thus, when all factors coincide with the criteria of a rule, the existence of such jobs is established." Id. When the Grids are properly relied upon, it is unnecessary for the Commissioner to identify specific jobs in the

economy that plaintiff can perform. <u>Heckler v. Campbell</u>, 461 U.S. 458, 467-68 (1983).

In this case the ALJ found that plaintiff's additional limitations had little or no impact on the occupational base of light unskilled work, and an "insignificant" impact on the sedentary and light occupational base of jobs. Because plaintiff's additional limitations did not erode the occupational base, the ALJ was not required to provide specific examples of jobs. Accordingly, the ALJ's use of the Guidelines was appropriate.

### VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

<u>    /S/   David D. Noce    </u>
**UNITED STATES MAGISTRATE JUDGE**

Signed on May 10, 2010.